MATHIS V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-02-320-CR

DENNIS LENARD MATHIS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION ON APPELLANT’S

PETITION FOR DISCRETIONARY REVIEW

------------

Pursuant to rule of appellate procedure 50, we have reconsidered our opinion upon Appellant’s petition for discretionary review.  
See
 
Tex. R. App. P.
 50.  We withdraw our July 8, 2004 opinion and judgment and substitute the following.

Appellant Dennis Lenard Mathis was indicted for the first-degree felony offense of burglary of a habitation and the second-degree felony offense of sexual assault.  
See
 
Tex. Penal Code Ann.
 § 30.02(a)(1), (d) (Vernon 2003), § 22.011(a)(1)(A), (f) (Vernon Supp. 2004).  Appellant was tried by a jury and found guilty on both counts.  Punishment was assessed at life and twenty years’ confinement, respectively.  Appellant raises three issues on appeal.  We will affirm.

I.  Factual and Procedural Background
 

At trial the State offered evidence that Mary Lewis (a pseudonym) lived in the Grayson Square Apartments in Grapevine, Texas on July 19, 2000.  That night Lewis fell asleep while watching television, and she was awakened by two hands being placed over her eyes.  The intruder held a cold metal object to her throat and wrapped a bandage around her eyes.  The intruder sexually assaulted Lewis with his finger and his penis.  While Lewis never saw the intruder, she stated that she recognized that he was African-American by the sound of his voice.

During the ensuing investigation, police retrieved Lewis’s nightgown and pillow, which were stained.  When the investigating police asked Lewis whether she knew of any African-Americans in the apartment complex, she told them that she had noticed Appellant on several occasions.  Lewis also testified that after the incident, she saw Appellant, who lived and worked at her apartment complex, and that he seemed to try and avoid her.  

Kim Greer, the apartment manager, testified that Appellant had become delinquent on his rent and that she had initiated eviction proceedings against him in September 2000.  The Grapevine police asked Greer to notify them when Appellant moved out.  In late September 2000, Appellant’s mother notified Greer that she was coming to clean out his apartment later that day, that she would be turning in his keys, and that he was no longer going to be a resident of the property.  Appellant’s mother subsequently cleaned out his apartment. Greer later informed the police of her belief that the apartment had been vacated or abandoned. 

On September 26
th, the police searched the apartment and seized evidence, including a drinking cup with a lip smudge on the rim.  Testing revealed that DNA from the drinking cup matched the DNA found on Lewis’s nightgown and pillow.  Based on this information, the police obtained an arrest warrant for Appellant.  After Appellant was arrested, the police obtained an evidentiary search warrant to draw blood from Appellant.  In his affidavit for the warrant, Officer James Timothy Hall stated under oath that he had reason to believe that there was evidence concealed on Appellant “tending to show” that Appellant was guilty of aggravated sexual assault.  The affidavit further stated that this evidence was “[a] representative sample of blood, that being 3 to 7 mls. placed in each of two E.D.T.A. tubes, commonly referred to as purple top tubes containing the preservative ethylenediaminetetraacetic acid.”  After stating the facts leading up to the request for the warrant, Officer Hall’s affidavit concluded by asking that “a warrant be issued to search for and seize a representative sample of blood from [Appellant] by transporting [him] to an appropriate medical facility . . . where qualified medical personnel may obtain the blood in accordance with accepted medical practices for DNA comparison.” 

Based on this affidavit, an evidentiary search warrant was issued.  The warrant stated that Officer Hall believed “that on the person of [Appellant] there is now being concealed certain property, namely a representative sample of blood, that being 3 to 7 mls. placed in each of two E.D.T.A. tubes, commonly referred to as purple top tubes containing the preservative ethylenediaminetetraacetic acid.”  The warrant ordered “the requested items” to be “obtained from the body of the accused in accordance with accepted medical procedure.”  Blood was subsequently drawn from Appellant, and testing indicated that DNA collected from Appellant’s blood sample matched the DNA from the stain on the victim’s nightgown. 

During trial, the State asked its DNA expert whether Appellant’s court-appointed DNA expert witness had access to the State’s evidence samples and accompanying paperwork.  Appellant did not object to this questioning.  After the State’s witness had been passed for cross-examination and a recess was declared, Appellant moved for a mistrial on the basis that the defense’s right to confer confidentially with its expert witness had been violated when the State identified the witness to the jury.  The court denied the motion.  The jury subsequently found Appellant guilty of both charged offenses and assessed his punishment at life and twenty years’ confinement. 

II.  Search of the Apartment

In his first two points, Appellant complains that his rights under article 38.23 of the Texas Code of Criminal Procedure, article I, § 9 of the Texas Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution were violated when the trial court denied his motion to suppress evidence, because Appellant had not vacated the apartment when the officers conducted a warrantless search of it.

Appellant does not distinguish his rights under the Code of Criminal Procedure, the Texas Constitution, and the United States Constitution from one another.  In fact, Appellant claims that the Fourth Amendment to the United States Constitution contains “similar language” to article I, § 9 of the Texas Constitution.  Therefore, we will address only whether the trial court’s denial of his motion to suppress violated his rights under the United States Constitution.  
See, e.g., Dewberry v. State
, 4 S.W.3d 735, 743-44 (Tex. Crim. App. 1999) (because defendant failed to distinguish his rights under the Texas Constitution from those under the federal constitution and combined all four points into one argument, Court of Criminal Appeals would address only whether defendant’s rights under the United States Constitution were violated), 
cert. denied
, 529 U.S. 1131 (2000); 
Hale v. State
, Nos. 2-03-143-CR, 2-03-144-CR, 2-03-145-CR, 2004 WL 1277888, at *2 (Tex. App.—Fort Worth June 9, 2004, no pet. h.) 
(because defendant did not point out any distinction between his rights to confrontation under the United States Constitution and the Texas Constitution, court would analyze defendant’s contention under the United States Constitution only). 

A.  Suppression Testimony

On September 21, 2001, Appellant filed a motion to suppress several items of evidence.  Appellant claimed that he had not vacated the apartment when the police searched it without a warrant.  On July 26, 2002, the court held a hearing on the motion.  At the hearing, Appellant’s mother testified that when Appellant was arrested on an unrelated misdemeanor charge in September 2000, he told her to move his belongings out of his apartment.   After moving some of his possessions, she left a note on the front door of the apartment indicating that she wouldn’t be returning for the property left in the apartment.  According to Appellant’s mother, Appellant did not express any interest in trying to go back and live in the apartment. 

Greer, the apartment manager, testified that after Appellant indicated he could not pay his rent for August 2000, she told him she intended to evict him from the apartment.  On September 25, a note telling Appellant to vacate the apartment by September 28 for non-payment of rent
 was posted on the apartment door.  That same day, Appellant’s mother came to the apartment and removed Appellant’s belongings.  According to Greer, Appellant’s mother stated Appellant was in jail and that he wouldn’t be back.  Also, a note indicating Greer could take possession of the apartment was left in her office by Appellant’s mother.  Greer never heard from either Appellant or his mother again. 

Police Sergeant James Hall testified that following the assault on Lewis, he asked the management of the complex to let him know if Appellant ever moved out of his apartment and to do so before cleaning the apartment.  On September 26th, Greer informed him that management had control of the apartment, that it had not been cleaned out, and that he could come over.  Hall stated he understood the apartment had been vacated and was back in the complex’s control.  Hall and an evidence technician subsequently entered the apartment and collected evidence, including a cup from which DNA evidence was taken. 

Patricia Bradbury, assistant manager of the apartment complex, testified that she let the police into the apartment.  According to Bradbury, the apartment was “empty, dirty.  And there was, I think, a chair in there, but it was vacant.  There was [sic] no clothes, no food, no couches, no nothing.  It was vacant.”  Appellant testified that after he had been incarcerated in September 2000, he asked his mother to go and take some of his things out of his apartment.  He stated that he and his mother never discussed what to do with the apartment. 

On July 29, 2002, the trial court denied appellant’s motion to suppress.  On August 1st, the court filed findings of fact and conclusions of law.  The court found, 
inter alia
, the following:  (1) Appellant’s mother came to the apartment to remove appellant’s belongings and conveyed to management that the apartment was being vacated and that Appellant would not be returning; (2) Appellant’s mother indicated that the remaining items in the apartment would not be retrieved; (3) Appellant’s mother placed the keys to the apartment in an envelope and taped the envelope to the door; (4) Greer notified Sergeant Hall that the apartment had been vacated and was available for inspection; and (5) when Patricia Bradbury entered the apartment, there was no furniture except for a recliner chair, and the apartment appeared to Bradbury to have been vacated. 

The trial court thus concluded that (1) the actions and statements of Appellant’s mother indicated to management that the apartment had been vacated and abandoned by Appellant, (2) upon inspection of the apartment by management, it appeared that it had been vacated and abandoned by Appellant, (3) management informed the Grapevine Police that the apartment had been vacated, (4) based upon this belief, police officers entered the apartment with the good-faith belief that the apartment had been vacated by Appellant, (5) as a result of the actions of Appellant’s mother, Appellant had no expectation of privacy in the remaining items in the apartment, and (6) the items seized by the police and the subsequent testing results were admissible as evidence at trial. 

B.  Analysis

When reviewing a trial court’s ruling, an appellate court should give almost total deference to the trial court’s determination of historical facts, especially when the trial court’s findings are based upon an evaluation of credibility and demeanor.  
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  A trial court’s decision whether to admit evidence is reviewed for abuse of discretion. 
 Osbourn v. State
, 92 S.W.3d 531, 537-38 (Tex. Crim. App. 2002).  When an appellate court reviews such a decision, the decision should be sustained if it is correct on any theory of the law applicable to the case.  
Id. 
at
 538.  This principle holds true even when the trial judge gives the wrong reason for his or her decision.  
Id.

The Fourth Amendment generally prohibits the warrantless entry of a person’s home, for purposes of either a search or an arrest.  
Illinois v. Rodriguez
, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990).  However, this requirement is sometimes supplanted if other elements make the unconsented search “reasonable.”  
Id.
 at 185, 110 S. Ct. at 2799.  As the United States Supreme Court has stated, 

[W]hat is generally demanded of the many factual determinations that must regularly be made by agents of the government— whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement— is not that they always be correct, but that they always be reasonable.           

Id.
 at 185-86, 110 S. Ct. at 2800.  This general rule applies to facts bearing upon the authority to consent to a search.  
Id.
 at 186, 110 S. Ct. at 2800.  Thus, a search may be reasonable if the person consenting to the search apparently has the authority to do so; that is, “determination of consent to enter must be judged against an objective standard:  would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?”  
Id.
 at 188, 110 S. Ct. at 2801 (citation and internal quotation marks omitted).

In 
Rodriguez
, the Supreme Court adopted the “apparent authority “ doctrine, holding that a warrantless entry by law enforcement officers onto a person’s premises does not violate the proscription against unreasonable searches and seizures under the Fourth Amendment where the entry is based upon the consent of a third party whom the officers, at the time of entry, reasonably believed to possess common authority over the premises, but who in fact did not have such authority
.  Id.
, 110 S. Ct. at 2801.
  
When an officer acts in good faith in conducting a search based on consent, the evidence may not be excluded merely because the officer made a reasonable mistake about the extent of the consenting party’s authority
.  See id.
 at 184
, 110 S. Ct. at 2799
.  

Whether the officers acted reasonably is judged by an objective standard, whether the facts available to the officer when the consent is given would warrant a person of reasonable caution in believing the consenting party had authority over the premises. 
 Id.
 at 188
, 110 S. Ct. at 2801.
   The doctrine does not allow officers to proceed without reasonable inquiry in the face of ambiguous circumstances or to accept at face value a consenting party’s ambiguous assumption of claimed authority to consent to the search.  
Id.
  The State bears the burden of proving that the person who gave consent had actual or apparent authority to do so. 
 Id.
 at 181
, 110 S. Ct. at 2797.

Appellant relies upon 
McNairy v. State,
 835 S.W.2d 101 (Tex. Crim. App. 1991)
, in which a landowner gave police officers consent to search her ten-acre tract without mentioning that a rented and occupied mobile home was at the back of the property.  The court of criminal appeals held that the intermediate appellate court erred in concluding that the officers were reasonably justified in searching the mobile home based on the apparent authority of the landowner, stating “we adhere to the general rule that a landlord cannot normally give effective consent to allow a search of a tenant’s premises.”  
Id
. at 105 (citing 
Chapman v. U.S.
, 365 U.S. 610, 81 S. Ct. 776 (1961).  Appellant also cites 
Moberg v. State
, 810 S.W.2d 190 (Tex. Crim. App. 1991), in which the court of criminal appeals likewise held that the police had no reasonable basis to believe that a motel manager possessed apparent authority to search appellant’s room before his rental period had expired or terminated.   

We acknowledge that the court of criminal appeals has not expressly adopted the apparent authority doctrine.  
Brimage v.
 
State
, 918 S.W.2d 466, (Tex. Crim. App. 1994) (stating the “closest this Court has come” to adopting doctrine was in 
McNairy
).  However, in 
Brimage
, the court provided a two-page analysis of the circumstances in which individuals broke into the appellant’s house and, as in 
McNairy
 and 
Moberg
, simply rejected the 
application
 of the apparent authority doctrine under the evidence in that case.  
Id.
 at 480-82.   

Moreover, the doctrine has been recognized by numerous intermediate appellate courts in this state.  
See, e.g., Davis v. State, 
93 S.W.3d 664, 668 (Tex. App.—Texarkana 2003, no pet.) (holding apparent authority of girlfriend established based on her presence in house and statements that she lived there);
 Corea v. State
, 52 S.W.3d 311, 317 (Tex. App.—Houston [1
st
 Dist.] 2001, pet. ref’d) (holding apparent authority of brother-in-law who owned residence became ambiguous once police learned no one but appellant lived in bedroom and was not established 
where they failed to investigate further); 
Riordan v. State
, 905 S.W.2d 765, 771 (Tex. App.—Austin 1995, no pet.) (holding apparent authority 
not established where officers’ superficial questioning did not disclose sufficient information to afford reasonable belief that visiting mother-in-law had authority to consent to search).  
See also Wilson v. State, 
04-02-00805, 2004 WL 624541 at *3 (Tex. App.—San Antonio 2004, no pet.) (not designated for publication) (holding apparent authority to consent to search vehicle established where appellant asserted it was his and was in possession of it at time of search); 
Giles v. State, 
No. 08-01-00080, 2003 WL 68178 at *4 (Tex. App.—El Paso 2003, no pet.) (not designated for publication) (holding State established apparent authority of wife based on statements that she lived with appellant in residence and her familiarity with location of items in residence); 
Speir v. State
, No. 05-00-01259, 2001 WL 722483 at *4 (Tex. App.—Dallas 2001, no pet.) (noting that, while not officially “adopted” in Texas, doctrine has been recognized, citing 
McNairy
 and courts of appeals cases).
(footnote: 1)
 In the instant case, the trial court was justified in finding that Sergeant Hall received a call from Greer telling him that management had control of the
 
apartment.  The court was also justified in finding that there was no furniture in the apartment except a recliner chair and a mattress without a frame.  Thus, the court was also justified in finding that when Bradbury, the assistant manager, led Sergeant Hall into the apartment, it appeared that the apartment had been vacated.  Under these circumstances, it was certainly reasonable for Hall to believe that the apartment had been vacated or abandoned, so that it was under control of management.  As such, Sergeant Hall’s belief that management had the authority to consent to the search was also reasonable.  Thus, the trial court did not abuse its discretion in denying Appellant’s  motion to suppress.  Appellant’s first and second points are overruled.

III.  Drawing of Appellant’s Blood

In his third and fourth points, Appellant complains that his rights under article 38.23 of the Texas Code of Criminal Procedure, article I, § 9 of the Texas Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution were violated when the trial court denied his motion to suppress evidence, because the search warrant used as authorization to draw a sample of Appellant’s blood did not actually authorize the drawing of Appellant’s blood.  Again, however, Appellant does not distinguish his rights under the Code of Criminal Procedure, the Texas Constitution, and the United States  Constitution from one another.  Therefore, we will address only whether the trial court’s denial of his motion to suppress violated his rights under the United States Constitution.  

A.  Suppression Testimony

In his motion to suppress, Appellant also claimed that the search warrant used by the police to draw a sample of his blood did not authorize the drawing of his blood.  During the suppression hearing, Sergeant Hall testified that he obtained the evidentiary search warrant in order to “draw blood from [Appellant’s] body and have it analyzed for DNA to see if it matched the semen left at the scene of the incident . . . .”  Hall stated that pursuant to the warrant, he and several other officers took Appellant to a medical facility and had blood drawn from Appellant.  Sergeant Hall explained where the language of the affidavit came from:

We kind of keep copies of other warrants that we’ve written for other cases, and you use some of those that you know withstood previous court situations and you kind of go by that.

And what I meant by this, kind of what it says is that I was wanting to get a sample of blood from the body of [Appellant] in the amount of three to seven milliliters that we could place into two separate tubes so that we could take those two tubes down to be analyzed for DNA purposes.

Sergeant Hall was subsequently asked by the State, “So although the language is maybe a little confusing, was it your intention or what you meant by that was to have the blood drawn and then perhaps placed in the tubes after it was drawn?”  He replied, “That is what I meant, sir, yes.”  

The trial court denied Appellant’s motion.  In its findings of fact, the court found that Sergeant Hall’s affidavit requesting the warrant and the warrant itself “were substantially the same in content”; that the search warrant “was not grammatically correct as [it] authorized a search of [Appellant’s] body for two vials of blood located on his body”; and that as a result of the warrant, police obtained samples of Appellant’s blood.  The court concluded that “[t]he search warrant and the accompanying affidavit, when read together in a common sense fashion, demonstrated that the police were seeking to obtain a sample of [Appellant’s] blood for testing purposes” and that “[t]he objections of [Appellant] to the search warrant are based on a hypertechnical reading of the warrant and affidavit.” 

B.  Analysis

Several of our sister courts have held that description errors in search warrants for real property are cured if, despite the erroneous description, the officer who executed the warrant actually knew which property to search and searched only that property.  
See, e.g., Taylor v. State
, 974 S.W.2d  851, 854-57 (Tex. App.—Houston [14th Dist.] 1998, no pet.); 
Smith v. State
, 962 S.W.2d 178, 181-85 (Tex. App.—Houston [1st Dist.] 1998, pet. ref’d); 
Jones v. State
, 914 S.W.2d 675, 678-79 (Tex. App.—Amarillo 1996, no pet.); 
State v. James
, 848 S.W.2d 258, 261 (Tex. App.—Beaumont 1993, no pet.);
 Mansell v. State
, 756 S.W.2d 95, 97-98 (Tex. App.—San Antonio 1988, pet. ref’d).

The instant case provides an analogous situation.  The affidavit appears to ask for authorization to search Appellant for two tubes of blood, and the warrant authorizes such a search.  However, the affidavit concludes by asking that a representative sample of blood be obtained from Appellant “in accordance with accepted medical practices for DNA comparison.”  Similarly, the warrant authorizes the requested items to be “obtained from the body of the accused in accordance with accepted medical procedure.”  Moreover, it was Sergeant Hall who, along with several other officers, took Appellant to a medical facility to have his blood withdrawn.  All of this cured the description error in the warrant.  Therefore, we hold that the trial court did not abuse its discretion in denying Appellant’s motion to suppress.  Appellant’s third and fourth points are overruled.

IV.  Defense’s DNA Expert

In his final point, Appellant claims that the trial court erred in denying his motion for mistrial, based upon the State’s revelation to the jury that the defense had the assistance of a DNA expert during the trial. 

At trial, the State asked its DNA expert witness, Carolyn Van Winkle, if the evidence samples tested and used by the State were available for testing by Appellant’s court-appointed forensic DNA expert, Joe Warren.  Van Winkle was also asked if the accompanying paperwork was provided to Warren.  Van Winkle testified in the affirmative to both questions.  Appellant did not object to this questioning, nor did he request a curative instruction from the trial court. Instead, Appellant moved for a mistrial after Van Winkle had been passed for cross-examination and following a recess.  The State argued, in part, that no objection had been made at the time of the questioning.  The defense stated, “Your honor, I sat here and debated objecting to it.  It was the old skunk-in-the-jury-box situation.”  The trial court overruled the motion for mistrial.   

In order to preserve error for appellate review, the complaining party must make a timely and specific request, objection, or motion that the trial court refuses.  
Tex. R. App. P.
 33.1(a).  The Court of Criminal Appeals recently held that a defendant may preserve error for appeal by moving for a mistrial without first making an objection and requesting an instruction to disregard.  
Young v. State
, 
No. 904-02, 2004 WL 1259872, at *1, *3-4 (Tex. Crim. App. June 9, 2004).  However, such a motion must still be timely.  
Id.
 at*
3-4
.  To be timely, an objection must be raised at the earliest opportunity or as soon as the ground for objection becomes apparent, i.e., as soon as the complaining party knows or should know that an error has occurred.  
Penry v. State
, 903 S.W.2d 715, 763 (Tex. Crim. App.), 
cert. denied
, 516 U.S. 977 (1995); 
Tell v. State
, 908 S.W.2d 535, 544 (Tex. App.—Fort Worth 1995, no pet.).

In the instant case, Appellant’s motion for mistrial came after Van Winkle had been passed for cross-examination and following a recess.  
Appellant indicated that he had “debated” objecting during the questioning. Thus, Appellant’s motion was made after the earliest opportunity and after the ground for objection became apparent. 
 As such the motion was not timely, and Appellant did not preserve error for appeal. 
 Penry
, 903 S.W.2d at 763.
 Appellant’s fifth point is overruled.
 

V.  Conclusion

Having overruled all of Appellant's points, we affirm the trial court's judgment.

ANNE GARDNER

JUSTICE

PANEL A: CAYCE, C.J.; GARDNER and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P. 
47.2(b)

DELIVERED:  September 7, 2004

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.7 (providing that unpublished cases may be cited, although they have no precedential value).